# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA CONROY,

               Plaintiff

    v.

CITY OF PHILADELPHIA and
PHILADELPHIA POLICE
DEPARTMENT,

               Defendants

CIVIL ACTION

No. 03-4240

## OPINION

March 15, 2006

In or about August 2002, plaintiff Lisa Conroy filed a Charge of Discrimination against the City of Philadelphia ("City") and the Philadelphia Police Department with the Equal Employment Opportunity Commission ("EEOC"), alleging sex-based discrimination. In April 2003, the EEOC issued Ms. Conroy a right-to-sue letter.[1] Ms. Conroy then initiated this action by filing a *pro se* complaint in July 2003 against the City and the Philadelphia Police Department. In March 2005, the Philadelphia Police

---

[1] The City has not raised any objection to Ms. Conroy's reliance upon a letter from the EEOC, rather than from the Attorney General. *See* 42 U.S.C. § 2000e-5(f)(1). Such an objection would likely fail given equitable considerations, but in any case, since there has been no objection, the issue has been waived. *See Zipes v. Trans World Airways, Inc.,* 455 U.S. 385, 393 (1982).

Department was dismissed as a defendant.  In April 2005, Ms. Conroy, represented by counsel, filed an amended complaint against the City, the Commonwealth of Pennsylvania ("State"), the Pennsylvania State Police ("State Police"), and the Municipal Police Officers' Education and Training Commission ("MPOETC" or "Commission"). The amended complaint alleges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as well as 42 U.S.C. §§ 1983, 1985, 1986, and adds a state tort claim.

On May 2, 2005, the City filed a motion to dismiss Ms. Conroy's amended complaint.  On August 19, 2005, the State, State Police, and Commission (collectively, "Commonwealth defendants") also filed a motion to dismiss.  Those two motions, and Ms. Conroy's responses, are presently before this court.

## I. Ms. Conroy's Factual Allegations

Ms. Conroy's amended complaint makes the following allegations, which must be accepted as true in deciding defendants' motions to dismiss:  Ms. Conroy applied for a position as a police officer with the City of Philadelphia's Police Department.  On October 12, 2001, she was accepted into a training program ("Police Academy") operated by the Philadelphia Police Department as a recruit.

On June 6, 2002, she was dismissed from the Police Academy because she failed a required portion of the standard physical fitness examination—the "sit-and-reach" flexibility test.  Ms. Conroy contends that she passed all other portions of the

examination, and that her failure of the sit-and-reach test was the only factor leading to her dismissal.

Ms. Conroy alleges that "the standards to pass the sit-and-reach test were higher for women than for men."[2]  In addition, she argues that the sit-and-reach test is not predictive of job performance, and states that the test was subsequently removed as a requirement for police recruits.  Amended Complaint ("Am. Complaint") ¶¶ 25-26. Finally, Ms. Conroy alleges that while other "Police Officer Recruits who failed aspects of the physical examination were offered the opportunity to retest, no such opportunity was offered to Plaintiff or, to the best of Plaintiff's knowledge and belief, to other failing female Police Officers Recruits."  *Id.* ¶ 34.

Upon plaintiff's dismissal from the Police Academy, Lieutenant Christopher Boyle of the Academy allegedly suggested to Ms. Conroy that she should find a job more suitable for a female.  Am. Complaint ¶ 27.  Ms. Conroy was subsequently offered a position as a Correctional Officer, a position she says "entail[s] a significantly lower rate of pay and prestige than that of a Police Officer."  She states that "compelled by financial need, [she] accepted the position."  *Id.* ¶ 23.

---

[2] The required fitness standards to become a police officer in Pennsylvania are based on an age and gender matrix—i.e., an applicant must score at or above a certain population percentile, in light of his or her age and gender. (One of Ms. Conroy's exhibits suggests the minimum sit-and-reach passing score for women her age was 19 inches, while the minimum passing score for men in the same age range was 16.5 inches.)

## II.  Ms. Conroy's Legal Claims

### A.  Amended Complaint

The first count of Ms. Conroy's amended complaint contends that the sit-and-reach portion of the examination was non-predictive of job performance, unlawfully discriminatory against women, and therefore improper.  She contends that her resulting termination was unlawful and constituted denial of equal protection, resulting in significant loss of income and earning potential.  Ms. Conroy also contends that the defendants' "actions were malicious, intentional, and willful and were done with deliberate indifference" to her rights, causing her "embarrassment, public humiliation, damage to her personal and professional reputation, and loss of respect among her class members." Am. Complaint  ¶¶ 38-39.  The City of Philadelphia's motion to dismiss characterizes this as a Fourteenth Amendment claim under 42 U.S.C. § 1983.   In light of Ms. Conroy's complaint to the EEOC, I presume this is also intended as a claim under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

In count two, Ms. Conroy reiterates these allegations but adds a conspiracy element and cites 42 U.S.C. § 1985.  *See* Am. Complaint ¶¶ 41-42.  I understand this to be a Fourteenth Amendment equal protection conspiracy claim under 42 U.S.C. § 1985(3).

In count three, Ms. Conroy alleges that the defendants "knew or should have known of the violations of [her] constitutional rights" and "had the power and/or authority to prevent" these violations.  She then restates the claim that the defendants'

4

actions were "malicious, intentional, and willful" and done with "deliberate indifference," and restates her alleged pecuniary and non-pecuniary losses. Am. Complaint ¶¶ 46-49. This appears to be a claim under 42 U.S.C. § 1986.

The fourth count of Ms. Conroy's amended complaint asserts that defendants' conduct violated 42 U.S.C. §§ 1983, 1985, 1986. This count essentially restates allegations contained in the first, second, and third counts. Ms. Conroy also reiterates the alleged comment by Lieutenant Christopher Boyle. Am. Complaint ¶¶ 51-55.

Finally, Ms. Conroy's fifth count makes a state tort claim for intentional infliction of emotional distress. Am. Complaint ¶¶ 57-60.

As to the relief sought, Ms. Conroy requests "full reinstatement as a Police Officer with the Philadelphia Police Department[3] or, in the alternative . . . readmi[ssion] to the Philadelphia Police Academy." Am. Complaint at 7-8. Ms. Conroy also seeks categories of damages, without elaboration, as follows: "frontpay, if appropriate; . . . backpay, if appropriate; . . . [compensation] for the wages and benefits of employment lost due to Defendant's unlawful conduct; . . . compensatory damages for future pecuniary losses, pain and suffering, convenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses as allowable." *Id.* at 8. Finally, Ms. Conroy seeks punitive damages, as well as interest, costs, fees, and expenses. *Id.*

---

[3] Although Ms. Conroy seeks "reinstatement," she does not allege that she was, at any time, a police officer in the Philadelphia Police Department.

**B.  Claims Withdrawn**

Ms. Conroy now voluntarily withdraws Count V of her amended complaint—the state tort claim for intentional infliction of emotional distress—as to the City of Philadelphia, as well as her claim of punitive damages against the City of Philadelphia. In light of the State's sovereign immunity, Ms. Conroy also voluntarily withdraws her 42 U.S.C. §§ 1983, 1985, 1986 claims against the Commonwealth defendants.

### III.  Discussion

**A.  City's Motion to Dismiss**

**1. Overview**

First, defendant City of Philadelphia ("City") argues that Ms. Conroy has failed to state any claim against the City.  *See* City's Mot. to Dismiss ("MTD") at 2; Fed. R. Civ. Pro. 12(b)(6).  The City contends that it was required by the State to administer the sit-and-reach test and to reject any recruits who failed the examination.  The City maintains that the State has sole responsibility for setting the standards, which led to the rejection of Ms. Conroy, and therefore Ms. Conroy's claims are only properly made against the State.

Second—if its first argument does not prevail—the City advances the narrower contention that Ms. Conroy's 42 U.S.C. § 1985(3) and 42 U.S.C. § 1986 claims are based on overly vague and conclusory allegations, and should be dismissed for failure to state a conspiracy claim.

While I agree with the City's second argument and therefore will dismiss Ms.

Conroy's § 1985(3) and § 1986 claims, I reject the City's first argument and conclude that dismissal of Ms. Conroy's Title VII and § 1983 claims against the City would be improper.

Ms. Conroy's amended complaint takes issue with the use of the sit-and-reach test on the ground that it is not job predictive, and impliedly contests the legality of the age- and gender-specific standards used to determine if one has passed the test. *See* Am. Complaint ¶¶ 25-26. Examination of relevant statutes and regulations supports the City's position that it was required to comply with the State's minimum training qualifications for police officers and to apply the State's minimum standards for physical fitness. However, the City has not shown where it is that the State officially set forth the specific requirement under which Ms. Conroy was dismissed. Moreover, as explained *infra*, even if the City's actions were compelled by the State's rules, the City would not be immunized from suit.

Ms. Conroy may also have a claim against the City if the test was improperly applied to her—that is, if the City conducted the process in a gender-discriminatory fashion in refusing to let her retake the sit-and-reach portion of the test. *See* Am. Complaint ¶ 34 (alleging that while men were allowed to retake parts of the test, she and other females were not). It is not clear that the City was required to reject Ms. Conroy without giving her another opportunity to pass the sit-and-reach test.

**2. Ms. Conroy's Claims Against the City, Generally**

The Municipal Police Education and Training Act, 53 Pa. C.S.A. § 2161 et seq.

(Pennsylvania Act 120), provides that the Commonwealth of Pennsylvania's Municipal

Police Officers' Education and Training Commission must establish a training program

for all municipal police officers.  *See* 53 Pa. C.S.A. § 2161.[4]  The Commission is further

tasked with promulgating minimum training qualifications, including mandatory

minimum standards for physical fitness.  *See* 53 Pa. C.S.A. § 2164(1), (8), (14).[5]

Under 53 Pa. C.S.A. § 2167(a), all municipalities are required to train all members

of their police departments in accordance with the provisions established by the

---

[4] The Pennsylvania State Police is an agency of the State and is responsible for the administration of the Municipal Police Officers' Education and Training Commission, which is also an agency of the State.  *See* 53 Pa. C.S.A. § 2161 et seq.

[5] The powers and duties of the Commission are set out in 53 Pa. C.S.A. § 2164, and include the following:

> (1) To establish and administer the minimum courses of study for basic and in-service training for police officers and to revoke an officer's certification when an officer fails to comply with the basic and in-service training requirements or is convicted of a criminal offense or the commission determines that the officer is physically or mentally unfit to perform the duties of his office or determines that a police officer subject to section 2166.1 (relating to prohibition on political activity) has engaged or participated in the conducting of political or election campaign activity in violation of that section.
> ...
> (8) To require minimum standards for physical fitness, psychological evaluation and education as prerequisites to employment as a police officer.
> ...
> (14) To make such rules and regulations and to perform such other duties as may be reasonably necessary or appropriate to implement the education and training program for police officers.

Commission.  The statute goes on to say that "[a]ny person hired as a police officer shall be ineligible to receive any salary, compensation or other consideration for the performance of duties as a police officer unless the person has met all of the requirements as established by the commission and has been duly certified as having met those requirements by the commission." 53 Pa. C.S.A. § 2167(b).  The final subsection, 53 Pa. C.S.A § 2167(c), states that "[a]ny person who orders, authorizes or pays as salary to a person in violation of the provisions of this subchapter commits a summary offense and shall, upon conviction, be sentenced to pay a fine of $100 or be imprisoned for a term not to exceed a period of 30 days."  Furthermore, "[t]he commission may stop payment of all funds paid or payable to municipalities under this subchapter for any violation of this subchapter."  *Id.*

The Commission, acting pursuant to 53 Pa. C.S.A. § 2161 et seq., has promulgated a number of regulations regarding the training of officers.  The basic training course requirements set by the Commission are broadly discussed in the Pennsylvania Administrative Code, Title 37, § 203.11(a)(11).  Subsection 203.11(a)(11) provides that to be certified as police officers, applicants must "successfully complete a basic police training course given at a Commission-certified school," and to do so must achieve the minimum grades established by the Commission.  *See also* 37 Pa. Admin Code § 203.11(a)(11)(F) (requiring "minimum grade as established by the Commission").  Pennsylvania Administrative Code, Title 37, § 203.51(b) lists "physical conditioning"

among the mandatory areas to be covered by the basic police training curriculum.

        (a) Whether state-mandated standards for police officers exempt the City from liability for the sit-and-reach test.

        In its motion to dismiss, the City contends that it was required by the State to administer the sit-and-reach test.  However, the City does not identify or cite any source for this requirement.  Ms. Conroy acknowledges that the Commission was empowered by the State to set, and indeed established, various standards for police officers.  However, Ms. Conroy's memorandum of law opposing the City's motion to dismiss argues that there is no evidence on record that "the sit-and-reach is one of those standards" set by the Commission.  *See* Pl.'s Memo. of Law Opposing City's Mot. to Dismiss at 6.[6]

---

    [6]  Ms. Conroy's amended complaint acknowledges that the sit-and-reach was established pursuant to the Commission's powers under 53 Pa. C.S.A. § 2161 et seq.  *See* Am. Complaint ¶ 21.  However, the subsequent paragraph erroneously attributes her dismissal to 37 Pa. Admin. Code § 203.11(a)(8)(v).  *See id.* ¶ 22 (asserting that the sit-and-reach test was "required . . . pursuant to, inter alia, [37] Pa. Admin. Code § 203.11(a)(8)(v)").

    Subsection 203.11(a)(8) was added to 37 Pa. Admin. Code § 203.11 in December 2003—after Ms. Conroy had been dismissed—to require applicants to pass a physical fitness evaluation before becoming eligible for training (i.e., an entrance examination).  *See* 33 Pa. B. 6046 (Dec. 12, 2003).  It makes the sit-and-reach test one of the five physical fitness elements applicants must pass "to be eligible for employment" as a police officer; the regulation specifies that a "person will not be enrolled in a recruit training program" unless he or she has scored in the 30th percentile for his/her age and gender.

    Ms. Conroy, on the other hand, was nearing the end of her training when she failed her sit-and-reach examination.  It appears that the sit-and-reach test she failed was part of the physical fitness testing area—a required component of her basic training course (i.e., an exit examination).  *See* Commission, Curriculum, *at* http://www.mpoetc.state.pa.us/ mpotrs/lib/mpotrs/miscellaneous/basic_police_curriculum_test_areas.pdf (listing the "academy physical requirements" as one of the testing areas).  I conclude that subsection

A variety of unofficial sources indicate that a final physical fitness test—consisting of the same elements as the entrance examination—is administered prior to graduation from basic police training programs in Pennsylvania, and that applicants must score at the 50th percentile to pass, and thereby qualify for state certification.  *See, e.g.*, Commission, Academy Physical Fitness Requirements: Final Test Final Requirements, *at* http://www.mpoetc.state.pa.us/mpotrs/cwp/view.asp?a=1133&q= 441066 (last modified Apr. 19, 2004); *see also United States v. City of Erie, Pennsylvania*, – F. Supp. 2d. –, 2005 WL 3610687 at *n.8 (W.D. Pa. Dec. 13, 2005) ("In order to complete academy training and obtain Act 120 certification, an individual must take the same MPOETC test [as the one described in § 203.11(a)(8)] and perform each of the components of the test at the 50th percentile of the individual's gender and age group."); *Brophy v. City of Phila.*, 2004 WL 1717616 (E.D. Pa. July 28, 2004) (implicitly referencing the 50th percentile requirement by noting that a 73 year old male applicant was required to complete the 1.5 mile run in 16:07 minutes, which is the 50th percentile mark given his age and gender).  Nonetheless, I must agree with Ms. Conroy that, to date, it has not been shown that the Commission promulgated a requirement that police officer

---

203.11(a)(11) and subsection 203.51(b), discussed *supra*, are the proper sources of general authority.  The question of whether (or where) the sit-and-reach test, specifically, is set forth by the Commission as a component of a mandatory physical fitness exit examination is discussed *infra*.  In light of Ms. Conroy's mistaken attribution and in light of the arguments presented in her memorandum of law, I do not construe Ms. Conroy's complaint to have conceded that the sit-and-reach test she failed was required by state law.

recruits pass a final sit-and-reach test in order to be certified.

Assuming *arguendo* that the State mandated use of the sit-and-reach examination at the time Ms. Conroy was tested, then the question remains whether the City can be sued for its actions pursuant to the State's requirements. The City contends it is not amenable to suit, but cites no case law to support its proposition. And such case law as there is suggests an outcome contrary to the City's position.

Typically, an alleged immediate wrongdoer can be sued: "[a] person aggrieved by the application of a legal rule does not sue the rule *maker* . . . . He sues the person whose acts hurt him." *Quinones v. City of Evanston*, 58 F.3d 275, 277 (7th Cir. 1995) (noting, in an age-discrimination case against a municipality, that "a discriminatory state law is not a defense to liability under federal law; it is a source of liability under federal law").[7]

_____

[7]An "undue hardship" defense may, in certain circumstances, excuse a wrongdoer acting pursuant to a state statute or regulation from liability for discrimination. For example, Title VII affords an exception to liability for religious discrimination based on undue hardship. *See* 42 U.S.C. § 2000e(j). In a 1990 Title VII case, the Third Circuit held that "it would be an undue hardship to require a school board to violate an apparently valid criminal [state] statute," which prohibited public school teachers from wearing religious dress, because doing so would require "exposing its administrators to a substantial risk of criminal prosecution, fines, and expulsion from the profession." *United States v. Bd. of Educ. for the Sch. Dist. of Phila.*, 911 F.2d 882, 891 (3d Cir. 1990) (en banc).

While the instant case also entails some risk of criminal enforcement under 53 Pa. C.S.A § 2167(c), it differs from *United States v. Board of Education for the School District of Philadelphia* on several critical grounds, particularly the lack of a statutory basis for an undue hardship defense in cases of gender-discrimination. *Cf. EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir. 1995) (suggesting, in an age-discrimination suit, that the appropriate target for suit might be the school districts which fired two teachers, and not the state under whose regulatory mandate the teachers were fired—where the state's

The viability of a § 1983 claim against the City for actions mandated by state law merits separate discussion, in light of the "municipal policy requirement" described in *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978) (holding that a municipality is liable under § 1983 for constitutional deprivations resulting from its own policies or customs, but cannot be held vicariously liable).  In 1987, a New Jersey district court noted that "somewhat surprisingly, there [was] little authority" on this issue.  *Davis v. City of Camden*, 657 F. Supp. 396, 402 (D.N.J. 1987).  Nearly twenty years later, that assessment remains apt; it appears that the *Davis v. City of Camden* opinion remains the only discussion in this circuit of § 1983 liability for municipal acts required by state law.

The court in *Davis* considered whether "because the policy [at issue] was mandated by a state regulation, the policy was not a 'county policy' as contemplated by *Monell* and its progeny, but a *state* policy that county officials merely enforced; and that accordingly, the County [could not] be held liable under § 1983 . . . ."  *Davis*, 657 F. Supp. at 402.  The court concluded that the County of Camden was liable for its "official adoption" of an unconstitutional strip search policy, notwithstanding the fact that the policy was mandated by a state regulation.  *Id.*  I am persuaded by the detailed reasoning presented in *Davis* that a municipality may be held liable where it has, in some way,

_____

provision was clearly invalid and there was no evidence the state tried to enforce it); *Davis v. City of Camden*, 657 F. Supp. 396, 403 (D.N.J. 1987) (noting the role of the qualified immunity defense in protecting officials from personal liability for reasonably relying upon and enforcing state law).

13

affirmatively adopted the policy or custom—albeit one that is required by the state—which is the driving force behind the alleged violation.  *See id.* at 402-04 (discussing Supreme Court precedent including *Monell* and *Owen v. City of Independence*, 445 U.S. 622 (1980), as well as case law from other circuits); *see also Evers v. County of Custer*, 745 F.2d 1196, 1198-99, 1203-04 (9th Cir. 1984) (drawing upon *Monell* and *Owen*, and concluding that the County of Custer could be held liable under § 1983 for decisions made and actions taken pursuant to the state code); *Caminero v. Rand*, 882 F. Supp. 1319, 1324 (S.D.N.Y. 1995) (reviewing the limited case law from other circuits and concluding that § 1983 liability is proper where "a plaintiff alleges that a municipality inflicted a constitutional deprivation by adopting an unconstitutional policy that was in some way authorized or mandated by state law," as potentially distinct from instances in which the municipality "simply enforces state law" and does not adopt any "specific policy in the area at issue").

I conclude that the City remains subject to suit.  The City has not yet established that it was acting pursuant to a State requirement.  Even assuming the City was so acting, a State mandate is no bar to the City's liability for gender-discrimination under Title VII—the Supremacy Clause directs that federal law takes priority.  Nor does the prohibition against vicarious liability under 42 U.S.C. § 1983 preclude municipal liability under that statute in this case, since Ms. Conroy has adequately alleged that the City affirmatively adopted the testing policy, which was the moving force behind her alleged

constitutional deprivation.  *See, e.g.*, Am. Complaint ¶¶ 21, 26, 32-34 (alleging that the

City adopted specific policies and/or customs, in accordance with the State's

requirements for police officers); *see also* Pl.'s Memo. of Law Opposing

Commonwealth's Mot. to Dismiss, Ex. A. (Letter from the EEOC investigator, discussing

the City's Police Academy's alleged policies for rejecting candidates); *cf.* Davis, 657 F.

Supp. at 404.[8]

    (b) <u>Whether Ms. Conroy's allegation that she was not accorded an</u>

<u>opportunity to retake the sit-and-reach test grounds a claim under Title VII and/or § 1983</u>.

    I now turn to Ms. Conroy's allegation that she was not given an opportunity to

retake the fitness test.  The Commission's regulations discuss, at subsection

203.11(a)(11)(ii)(F)(I)-(II), the implications of failing a tested area:

---

[8] *Davis* suggests that *Evers v. County of Custer*, cited in the text *supra*, is an example of a court imposing liability on a local government body for unconstitutional policies which were "authorized, but not mandated by state law."  *Davis*, 657 F. Supp. at 403.  However, this reading of *Evers* seems to overlook the fact that the state code imposed a "duty" on local officials to take action.  *Evers v. County of Custer*, 745 F.2d 1196, 1198 n.1 (9th Cir. 1984).

Although I differ with *Davis* as to the proper characterization of *Evers*, I agree that some courts have distinguished between a municipality's liability for acts authorized by the state, versus those required by the state—concluding that a local government may not be insulated from liability for acts merely authorized by the state (or where the local body has some discretion), but is insulated from liability for acts commanded by the state.  *See, e.g.*, *Bethesda Lutheran Homes & Servs., Inc. v. Leean*, 154 F.3d 716 (7th Cir. 1998); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993).

Even if this position were to be adopted by the Third Circuit, dismissal of Ms. Conroy's § 1983 claims at this time would be inappropriate given the allegations contained in Ms. Conroy's complaint and the ambiguity of the contextual materials currently before this court.

(I) Applicants not achieving the minimum grade in any tested area shall repeat the failed training in that area before being eligible to take the examination in that tested area at a Commission-certified school. If the applicant fails to achieve the minimum grade on the applicant's second attempt, the applicant shall be required to successfully retake and pass the entire basic police training course to qualify for certification.

(II) Applicants not achieving the minimum grade in two separate tested areas during one basic police training course shall be required to retake and pass the entire basic police training course in order to qualify for certification.

In *Brophy v. City of Philadelphia*, the court noted that "[a]lthough the statute provides applicants not achieving the minimum grade in any tested area shall repeat the failed training in that area before being eligible to take the examination, Brophy presents no evidence that he requested to repeat the training or was denied such opportunity." 2004 WL 1717616, at *7. Similarly, Ms. Conroy makes no allegations regarding a request to repeat training; she asserts only that she was not given a second chance to take the sit-and-reach test.

It is clear from the regulations that the City was prohibited from hiring Ms. Conroy as a police officer without her passing the various required tests. *See* 53 Pa. C.S.A. § 2167(b)-(c). However, the regulatory language of subsection 203.11(a)(11)(ii)(F)(I)-(II) does not make clear either that the City had to expel Ms. Conroy from the training program after the first failed sit-and-reach, or that the City was required to let her retake the test (or abused its discretion by not offering her the chance to retake the test). While it is not apparent that Ms. Conroy had a clear entitlement to a second opportunity to take the test, the language of subsection 203.11(a)(11)(ii)(F)(I)-(II) at least suggests that she

could have been allowed a second chance.  Thus, Ms. Conroy may have a Title VII claim

against the City if she can establish, as alleged, that she was refused an opportunity to

retake the test on the basis of gender.  *See* 42 U.S.C. § 2000e-2(a) (2000); *see also Tex.*

*Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981) (allowing disparate treatment

claim by an employee based on claims of gender discrimination).  She may also have a

related § 1983 claim if she can show that this was done pursuant to one of the City's

official policies or customs.  *Cf.* Am. Complaint ¶ 34.

### 3.  Ms. Conroy's Conspiracy-Related Claims

The City argues that Ms. Conroy's conspiracy claims, under 42 U.S.C. § 1985(3)

and 42 U.S.C. § 1986, fail because she has not alleged "more than 'vague and conclusory

allegations.'" *See* City's MTD at 4 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th

Cir. 1987)).

It is well settled that conspiracy claims must be pled with some degree of

specificity: "[Plaintiff] must allege specific facts that the Defendants reached an

understanding or agreement to violate the [Plaintiff's] constitutional rights." *Boykin v.*

*Bloomsburg Univ. of Penn.*, 893 F. Supp. 409, 417 (M.D. Pa. 1995) (citing *Ersek v.*

*Township of Springfield*, 822 F. Supp. 218) (E.D. Pa. 1993) (Ditter, J.)).   Ms. Conroy's

amended complaint alleges no facts regarding a conspiracy; the extent of her allegation is

simply her statement that the Commission, through its adoption of the sit-and-reach test,

and the City, through its application of the test, conspired to deny Ms. Conroy her equal

protection rights.  This is insufficient, and so Ms. Conroy's 42 U.S.C. § 1985 conspiracy claims will be dismissed.

Relatedly, Ms. Conroy's 42 U.S.C. § 1986 claims must be dismissed.  *See Toth v. Bristol Township*, 215 F.2d 595, 599 (E.D. Pa. 2002).  Section 1986—which provides a cause of action against those who know a § 1985 violation is to be committed and have the power, but fail, to prevent it—requires a predicate violation of 1985.  *See, e.g.*, *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994).

## B.  Commonwealth Defendants' Motion to Dismiss

Since Ms. Conroy has voluntarily withdrawn her § 1983, § 1985, and § 1986 claims against the Commonwealth defendants, the only remaining claims against those defendants are her Title VII claim and her state tort claim.

### 1.  Title VII of the Civil Rights Act of 1964

The Commonwealth defendants argue two grounds for dismissal of Ms. Conroy's Title VII claim: (1) the fact that Commonwealth defendants were not Ms. Conroy's employer or prospective employer, and (2) the lack of notice of a right to sue these defendants prior to filing her amended complaint.  Because I agree with the Commonwealth defendants' first argument, I will not reach the second.

Title VII, 42 U.S.C. § 2000e-5, allows an aggrieved person to bring suit against an "employer, employment agency, labor organization, or [in some cases a] joint labor-management committee."  To satisfy this Title VII requirement, the defendant need not be

the plaintiff's actual or direct employer:  "[W]here [a] defendant, though not the

plaintiff's employer, nevertheless has such a degree and range of control over the plaintiff

that it is the plaintiff's *de facto* or indirect employer . . . the relationship of the parties

should be regarded as an employment relationship."  *Tyrrell v. City of Scranton*, 134 F.

Supp. 2d 373, 380 (M.D. Pa. 2001) (observing that a plaintiff must allege an actual or *de*

*facto* employment relationship–past, present, or prospective–with the employer and

holding that students in a training program were not "employees" of that program); *see*

*United States v. Bd. of Educ. for the Sch. Dist. of Phila.*, 911 F.2d 882, 891 (3d Cir.

1990).

      The Commonwealth defendants maintain that they cannot be considered Ms.

Conroy's employer, despite the State's controls over the hiring and certification process.

Ms. Conroy concedes that the City had some forms of independent control over the hiring

of Ms. Conroy but maintains that the State had "sufficient sway" that it should be

considered her *de facto* employer.

      Whether or not the Commonwealth defendants qualify as indirect employers for

the purposes of a Title VII claim depends on whether the State is deemed to have

"extensive control" or to have played a purely regulatory role.

      In *United States v. Board of Education for the School District of Philadelphia*, 911

F.2d 882 (3d Cir. 1990), the Third Circuit found that the Commonwealth in "various ways

exercise[d] control over the terms of employment of public school teachers" but held that

19

the Commonwealth (as opposed to the municipality) was not liable to the teachers, as

their employer, under 42 U.S.C. § 2000e-2(a).  *Id.* at 891-92.  The court reached this

holding because the Commonwealth's "control [was] exercised exclusively in its

regulatory capacity rather than in the course of a customary employer-employee

relationship." *Id.* at 891 (citing *George v. New Jersey Board of Veterinary Medical

Examiners*, 635 F. Supp. 953, 956 (D.N.J. 1985), *aff'd*, 794 F.2d 113 (3d Cir.1986)

(holding that licensing activities of the New Jersey Board did not make the Board of

Veterinary Medical Examiners an "employer" under Title VII)).

     The district court in *Tyrrell v. City of Scranton* distinguished between a theory

under which Title VII liability would be applicable "wherever a defendant employer has

control over the plaintiff's access to employment, even where the plaintiff is not employed

by the defendant, but by a third party"—also known as an "aiding or abetting" or

"interference" model, *cf. Sibley Memorial Hosp. v. Wilson*, 488 F.2d 1338, 1341 (D.C.

Cir. 1973)—and the "narrower" approach taken by the Third Circuit in *United States v.

Board of Education for the School District of Philadelphia.  Tyrrell*, 134 F. Supp. 2d at

378.  In this regard, the court also likened the Third Circuit's approach to that taken by

the Seventh Circuit in *EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir. 1995).  *Tyrrell*, 134 F.

Supp. 2d at 379-80.

     In *EEOC v. Illinois,* the EEOC challenged the State's administrative code, which

required teachers to retire at age 70.  The court observed that the "state was acting in its

regulatory rather than its proprietary capacity, for it was regulating other employers, the school districts." *EEOC*, 69 F.3d at 170.   The court acknowledged that the State "exert[ed] more control over public school teachers than . . . probably over any other persons formally employed by local governments in the state."   However, the court concluded that the key powers of hiring and firing remained in the hands of the local districts, although constrained by the state's code.  *Id.* at 171-72 (citing cases holding that the State's role in licensing of teachers did not make the State their "employer").  The Seventh Circuit held that the State did not qualify as an indirect employer of the teachers because its control was not "so extensive[]," and therefore the State was not liable under the ADEA.  *Id.* at 171.

In the instant case, the State essentially functions as a licensor—granting certification to individuals to become police officers.   While I note that provisions such as 53 Pa. C.S.A. § 2167(c) (threatening to stop payments of funds to municipalities who ignore the state's mandatory qualifications for police officers) add complexity to the instant case, the more important fact is that the State does not tell Philadelphia when to hire or fire a police officer, or how much to pay them.  *Cf. EEOC v. Illinois*, 69 F.3d at 169, 171-72.  Furthermore, Philadelphia may add its own eligibility requirements to those imposed by the State; city residency requirements are a familiar example.  *See McCarthy v. Phila. Civil Serv. Comm'n*, 424 U.S. 645 (1976) (upholding Philadelphia's municipal regulation requiring city employees to meet residency requirements).

In sum, the City's ability to place its own requirements upon the hiring process,[9] its control over the rate of hiring, and its authority vis à vis firings, all militate against finding that the Commonwealth has an indirect or *de facto* employment relationship with Ms. Conroy.  Therefore, Ms. Conroy's claims against the State will be dismissed.

**2. State Tort Law Claim**

Finally, in light of the dismissal of Ms. Conroy's federal claims against the State, her state law claim for intentional infliction of emotional distress will also be dismissed. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988).

## Conclusion

An order effectuating the foregoing rulings accompanies this opinion.

---

[9] For example, in addition to its residency requirement, Philadelphia also requires that new police officer hires be between the ages of 19 and 40.  *See* Philadelphia Police Dep't, *at* http://www.ppdonline.org/career/career_require.php.  The State's regulations require only that they be 18 years of age or older.  *See* 37 Pa. Admin Code § 203.11(a)(1).

22

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA CONROY,

            Plaintiff

    v.

CITY OF PHILADELPHIA and
PHILADELPHIA POLICE
DEPARTMENT,

            Defendants

CIVIL ACTION

No. 03-4240

## ORDER

March __, 2006

Defendant City of Philadelphia and the Commonwealth defendants—the Commonwealth of Pennsylvania, the Pennsylvania State Police, and the Municipal Police Officers' Education and Training Commission—have moved for dismissal of this suit brought by plaintiff Lisa Conroy.

Plaintiff has now withdrawn her state tort claim for intentional infliction of emotional distress (Count V) as to the City of Philadelphia, as well as her claim of punitive damages against the City. Plaintiff has also now withdrawn her 42 U.S.C. §§ 1983, 1985, 1986 claims (Counts I-IV, except insofar as a Title VII claim is made) against the Commonwealth defendants.

Accordingly, and for the reasons stated in the foregoing memorandum opinion, it is hereby ORDERED as follows:

(1) Count V of plaintiff's amended complaint and plaintiff's claim for punitive damages are DISMISSED, as withdrawn, against the City of Philadelphia.

(2) Defendant City of Philadelphia's motion to dismiss (Docket # 24) is GRANTED in part and DENIED in part.  The motion is GRANTED with regard to plaintiff's claims under 42 U.S.C. § 1985 and 42 U.S.C. § 1986.  Therefore, Counts II and III of the amended complaint, as well as Count IV insofar as it makes such claims, are DISMISSED against the City.  With regard to Count V of plaintiff's amended complaint and plaintiff's claim for punitive damages, the City's motion is DISMISSED as moot. The remainder of the City's motion is DENIED.

(3) Counts II, III, and IV, as well as Count I insofar as it makes a claim under 42 U.S.C. § 1983, of plaintiff's amended complaint are DISMISSED, as withdrawn, against the Commonwealth defendants, with the further result that the portion of the Commonwealth defendants' motion to dismiss (Docket #27) that is directed at the foregoing counts of the amended complaint is DISMISSED as moot.  The balance of the Commonwealth defendants' motion to dismiss, which is directed at plaintiff's claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., is GRANTED.

(4) Count V of plaintiff's amended complaint is DISMISSED as to the Commonwealth defendants.

/s/ Louis H. Pollak

Pollak, J.